**GENERAL ELECTRIC COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

**United Electrical, Radio and Machine
Workers of America, Intervenor.**

Nos. 96–1247, 96–1354.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 7, 1997.

Decided July 18, 1997.

Dorothy Rosensweig, New York City, argued the cause and filed the briefs for petitioner General Electric Company. With her on the briefs was Carmelo Grimaldi.

Polly J. Halfkenny, Pittsburgh, PA, argued the cause for petitioner United Electrical, Radio and Machine Workers of America. With her on the briefs was Mary E. Leary.

Steven B. Goldstein, Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent. With him on the brief were Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel and Margaret G. Neigus, Supervisory Attorney.

Polly J. Halfkenny, Pittsburgh, PA, argued the cause for intervenor United Electrical,

Radio and Machine Workers of America. With her on the brief was Mary E. Leary.

Harold P. Coxson, Jr., Washington, DC, filed the brief for amicus curiae Council on Labor Law Equality.

Before: GINSBURG, SENTELLE and TATEL, Circuit Judges.

Opinion for the Court by Circuit Judge TATEL.

In these consolidated petitions for review, we consider several National Labor Relations Board rulings arising out of a union representation election and its aftermath. The NLRB ruled that certain statements made by the company during the campaign and a post-election gift to employees violated the National Labor Relations Act. The company's firing of a pro-Union employee, the Board ruled, did not violate the Act. Concluding that some of the company's campaign statements were protected speech, we grant the company's petition in part and deny it in part. We deny the company's petition with respect to the post-election gift to employees, as well as the Union's petition regarding the company's firing of the pro-Union employee.

I

For the past fifty years, General Electric and the United Electrical, Radio and Machine Workers of America have had a national collective bargaining agreement that applies to any newly organized bargaining unit, provided that the new local ratifies the agreement within 30 days. New locals have always ratified the National Agreement. Among other things, the National Agreement allows ten holidays per year and establishes procedures for determining vacation pay. All hours worked in excess of eight hours per day or forty hours per week are paid at time-and-one-half, as is Saturday work. Sunday work is paid at double time.

General Electric operates a plastics plant in Washington, West Virginia. The company gives its Washington employees eleven holidays a year and provides for a two percent vacation bonus. Production and maintenance employees work in twelve-hour shifts. The company pays overtime for hours in excess of

forty per week and for all Sunday work; Saturday work is paid at straight time.

In 1989, the Electrical Workers began a campaign to organize the Washington plant's production and maintenance employees. Conducting their own campaign against the Union, plant supervisors met with workers, gave speeches about the effect of unionization on the plant, and distributed handbills. The company warned that if the Union won the election, employees would lose their eleventh holiday, two percent vacation pay, and twelve-hour shifts, and might face temporary layoffs.

After losing the March 1992 election by a considerable margin, the Union filed objections and an unfair labor practice charge. Almost two years later, the company fired a vocal Union supporter, Fernando DaCosta, and the Union responded with a second unfair labor practice charge. Following a hearing, the Administrative Law Judge found that General Electric had violated section 8(a)(1) of the National Labor Relations Act by threatening employees with loss of benefits and changes in conditions of employment, discontinuance of investment in the plant, and temporary layoffs, as well as by giving benefits to employees while election objections were pending and warning employees against protesting or discussing DaCosta's termination. Finding that the General Counsel failed to show that GE fired DaCosta because of his union activity, the ALJ dismissed the unlawful termination allegations. With only minor changes, the NLRB adopted the ALJ's findings.

GE petitions for review of the Board's finding of multiple section 8(a)(1) violations. The Union petitions for review of the dismissal of the unfair labor practice charges stemming from DaCosta's termination. We uphold the Board unless its findings are unsupported by substantial evidence in the record considered as a whole, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Allegheny Ludlum Corp. v. NLRB*, 104 F.3d 1354, 1358 (D.C.Cir.1997), or unless the Board " 'acted arbitrarily or otherwise erred in applying established law to the facts.' " *Allegheny Ludlum*, 104 F.3d at 1358 (quoting *International Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1536 (D.C.Cir.1994)). Although our review is deferential, we are not merely "the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning...." *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980). In particular, we must take account of anything in the record that "fairly detracts" from the weight of the evidence supporting the Board's conclusion. *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464–65.

## II

Section 8(a)(1) of the NLRA prohibits employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the[ir] rights" to form, join, or assist unions. 29 U.S.C. § 158(a)(1) (1994); *see also id.* § 157 (1994) (guaranteeing employees the right to organize). While section (8)(a)(1) thus protects employees' associational rights, section 8(c) protects employers' rights to express their views as long as such expression "contains no threat of reprisal or force or promise of benefit." *Id.* § 158(c). Addressing the relationship between sections 8(a)(1) and 8(c), the Supreme Court in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969), held that employers' rights to speak freely on the effects of unionization cannot trump employees' rights to unionize:

> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. If there is any implication that an employer may or may not

take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*See also Laborers' Dist. Council of Georgia and South Carolina v. NLRB,* 501 F.2d 868, 874 (D.C.Cir.1974) (employers' opinions and predictions of unfavorable consequences will not violate Act "if they have some reasonable basis in fact and are in fact predictions or opinions and not veiled threats of employer retaliation").

Two of our post-*Gissel* cases, *Crown Cork & Seal Co. v. NLRB,* 36 F.3d 1130 (D.C.Cir. 1994), and *Allegheny Ludlum,* provide the framework for analyzing the statements at issue in this case. *Crown Cork & Seal* arose from the Steelworkers' attempt to organize Crown's Vineland, New Jersey, manufacturing plant. The Steelworkers had a Master Agreement that automatically extended to newly unionized Crown plants. The Master Agreement included a wage scale higher than Vineland's. During its campaign to organize the Vineland plant, the Union circulated a flyer raising the issue of job security. The company responded with a letter of its own: "WE WILL NOT BRING WORK INTO THIS PLANT—AND OUR CUSTOMER WILL SEEK OTHER ALTERNATIVES— IF THAT WORK CAN'T BE DONE AT A REASONABLE COST...." *Crown Cork & Seal,* 36 F.3d at 1133. "*NO* union," the letter concluded, "can keep you employed and *NO* union can guarantee you a paycheck every week if we cannot provide our customers with the high quality products at competitive prices they have come to expect from us here at Vineland." *Id.* In a separate statement, Crown informed its employees that pending the election, it would suspend plans to transfer two projects to the Vineland plant and that the projects would be "*re-evaluated* [after the election] because they are very sensitive to increased costs." *Id.* at 1136. The company also told employees that if the Union won the election, they could no longer participate in the company's retirement thrift

plan because it was not provided for in the Master Agreement. *Id.* at 1140.

The NLRB ruled that the letter, as well as the company's statements that it would suspend certain projects pending the outcome of the election and that it would discontinue the retirement thrift plan if the union won, violated section 8(a)(1) of the NLRA. Vacating the Board's decision, we held first that the company's letter could not be read as threatening to close the plant but was instead "defensive," designed to respond to the Union's effort to "seize the job security issue as its own." *Id.* at 1134. As to the company's statement that it would suspend certain projects pending the election, we concluded, relying on *Gissel,* that the statement did no more than predict "a standard company response to increased prices." *Id.* at 1139. And although finding the Master Agreement ambiguous regarding whether Crown's Vineland employees could retain their retirement benefits, we concluded that because evidence of past practice supported Crown's reading of the Agreement—no Crown plant had retained a retirement plan after unionization— the company's statement that it would take away the retirement thrift plan was a " 'reasonable' one 'based on available facts,' and [could] not be the basis of an unfair labor practice." *Id.* at 1141 (quoting *Gissel,* 395 U.S. at 618, 89 S.Ct. at 1942).

Attempting to stave off unionization of its salaried employees, the employer in *Allegheny Ludlum* stated in a newsletter that despite poor business conditions, layoffs of unionized employees, and a recent strike, it had always "found ways to manage the situation without resorting to layoffs of its salaried employees." *Allegheny Ludlum,* 104 F.3d at 1357. The newsletter included a quotation from an employee: " 'if it came to a layoff due to lack of work, the first people to be laid off would be those in the Union.' " *Id.* A cartoon depicted a Union rat pulling a blanket marked "Secure Job at AL" off a sleeping Allegheny Ludlum worker. *Id.*

We agreed with the Board that the statements and cartoon "combined to create an unlawful threat that the Company would retaliate against salaried employees if they elected to be represented by the Union."

*Allegheny Ludlum,* 104 F.3d at 1364. We pointed out that *Crown Cork* and a similar case, *Somerset Welding & Steel, Inc. v. NLRB,* 987 F.2d 777 (D.C.Cir.1993), presented a very different situation, i.e., "employer statements that linked unionization to the loss of job security by referring expressly to factors outside of the employer's control— union pressure to increase wages and market conditions." *Allegheny Ludlum,* 104 F.3d at 1367. As we observed, "[t]he employers in those two cases were communicating to employees their prediction that if the employees voted to unionize, the companies would be obliged to increase wages for the newly-unionized employees, and this in turn would damage the employers' ability to attract business in light of market conditions." *Id.* In contrast, because Allegheny Ludlum's predictions of decreased job security were not "linked" to objective facts beyond the employer's control, we viewed them as threats unprotected by the Act.

With *Gissel, Crown Cork,* and *Allegheny Ludlum* in mind, we turn to the statements at issue in this case. We ask whether GE based its predictions about the effect of unionization on objective facts about consequences beyond its control, *Gissel,* 395 U.S. at 618, 89 S.Ct. at 1942; *Crown Cork,* 36 F.3d at 1137, or whether its predictions were unrelated to economic necessity, thus amounting to threats of reprisal unprotected by the NLRA. *Allegheny Ludlum,* 104 F.3d at 1367.

### Eleventh Holiday and Vacation Pay

■ Several months before the election, the Washington plant's general manager, Robert Smith, held a number of meetings with the plant's production and maintenance workers. At each meeting, Smith used transparencies stating, "GE–UE National Agreement would automatically change the following practices . . . Eliminate 11th Holiday. Eliminate 2% Vacation Pay. Change overtime and nightshift premiums. Change all local pay practices to conform to National Agreement." J.A. 591. Terry Hindmarch, the company's labor relations officer, also held employee meetings where he too displayed transparencies to show differences between the National Agreement and practices

at the Washington plant. One of his transparencies included a reference to "Holidays—Automatically Lose One" and "2% Vacation Payment." J.A. 768.

Finding that GE failed to show that the loss of the extra holiday or the two percent vacation pay was "likely to result from negotiations with the Union or that the GE–UE [National] Agreement mandated such losses and changes," the ALJ concluded that Smith's and Hindmarch's statements violated the Act. J.A. 73–74. We cannot square this conclusion with the record. A product of bargaining between the Union and GE, the National Agreement provides for ten holidays, one fewer than the Washington plant allows, and makes no provision for a two percent vacation bonus. Moreover, the Agreement automatically kicks in after ratification by a new local, and the ALJ found that new locals always ratify the Agreement. In one of its handbills, the Union even conceded that employees would lose their two percent vacation pay under the National Agreement. *See* J.A. 645. While the Agreement provides for "local understandings," such understandings come about only after formal negotiations between the Union local and management, and a Union representative conceded that General Electric has no obligation to negotiate local understandings. J.A. 1346–47 (Test. of Stephen Tormey). GE's predictions that employees would lose their eleventh holiday and two percent vacation pay if they came under the National Agreement were thus grounded in objective fact. *See Gissel,* 395 U.S. at 618, 89 S.Ct. at 1942; *Crown Cork,* 36 F.3d at 1137.

### Smith's Speech

■ Shortly before the election, Robert Smith held several more meetings with the plant's production and maintenance employees, at which he read a prepared speech stating in part:

[O]ur business (like many others) has been rocked by a world-wide recession that has made winning even tougher. When we started taking these [revitalization] actions last year, I said that change would not be easy and not everything we did would be perfect, but together we would work to fix our mistakes. I believe we can still do

that and do it without the UE. A union that doesn't, in my opinion, understand our business or what we believe in here.

The choice we make this (next) week will have a profound impact on our future. The people who buy our products, our sales force that sells our products and the company that supplies the investment dollars for our growth are all watching what happens here. We need to send them a signal, a clear signal that tells them they can count on us to be a dependable supplier, committed to continuous improvement without the threat of possible strikes. The best way to send this signal is to vote "NO" on Thursday and Friday.

In every difficult situation there are lessons to be learned. This long campaign has taught us all the need for more open, straightforward communications and the necessity to be responsive. We must learn to work together and get everyone involved in the business. I'm afraid if we can't do that—we won't have a business here ten years from now.

. . . .

The Union promises the comfort of the past and a return to a world that no longer exists in the plastics industry. If you choose the UE, we could be heading in the wrong direction.

I believe there is tremendous potential in this organization and there is nothing we cannot do together. But if the UE divides our forces, I honestly do not know what could happen to this site.

J.A. 726, 727–29. Finding this speech to have sent a message that choosing the Union "would result in disharmony among the Washington plant employees and cause GE to shut [the plant] down," the ALJ ruled that the speech violated the Act. J.A. 75. According to the ALJ, Smith "*warned* the listening employees that they 'must learn to work together and get everyone involved in the business' or 'we won't have a business here ten years from now.'" *Id.* (emphasis added). The ALJ further concluded that Smith's "*warning*" that GE would withhold further investment in the plant if employees voted in the Union "raise[d] *the spectre of a loss of* jobs." *Id.* (emphasis added).

Again, we cannot square the ALJ's conclusions with the record. Smith did not "warn" employees that General Electric would retaliate if the Union won the election. He instead conveyed to employees the risks of voting in the Union, risks that were, as in *Gissel,* beyond the employer's control. According to Smith, those risks included the possibility of strikes interrupting shipments to customers, as well as of GE—operating in an increasingly competitive environment—reducing its investment in the plant. These concerns with maintaining competitive position are quite similar to those voiced by the employer in *Crown Cork. See Crown Cork,* 36 F.3d at 1134 (work will only be done at Vineland plant "if we can maintain our competitive advantage"); *id.* ("[Y]our job security depends on our being able to provide [our buyer] with the best product and the best service at the best price."). But in this case, the ALJ turned the company's concerns into warnings, for example, that if the employees failed to keep the peace at the Washington plant, "'we won't have a business.'" J.A. 75 (quoting Smith speech). As we said in *Crown Cork,* "[i]f the Board may take management statements that very emphatically assert a risk, twist them into claims of absolute certainty, and then condemn them on the grounds that as certainties they are unsupported, the [employer's section 8(c)] free speech right is pure illusion." *Crown Cork,* 36 F.3d at 1140.

Not only do General Electric's statements resemble Crown's, but they differ from the statements at issue in *Allegheny Ludlum,* where the employer made no attempt to ground its warnings of loss of job security in objective circumstances, such as the competitive environment and need to contain costs. Allegheny Ludlum "in effect told salaried employees that unionization would lead to layoffs and a loss of job security *because* once the salaried employees chose union representation the Company would no longer 'find ways' to avoid laying them off in hard times." *Allegheny Ludlum,* 104 F.3d at 1367 (emphasis added). The "because" in *Allegheny Ludlum*—that the company would not work as hard to keep Union members on the payroll—was entirely within the company's

control. Here, as in *Crown Cork*, the "because" was a set of objective factors beyond the employer's control: unionization increased the risk of strikes, which would in turn increase costs, lower production, and lead customers to buy, and the parent company to invest, elsewhere. *Crown Cork* thus controls this aspect of the case.

### Twelve–Hour Shifts

■ Also shortly before the election, a low-level plant supervisor, Marvin Brannon, told an employee that if the Union won, the company "would close the plant and do away with the 12–hour days within two weeks." J.A. 934 (Test. of Dale Ramsey). When the employee replied that Brannon could not believe that himself, Brannon changed the subject. The ALJ found that because Brannon failed both to qualify his statement as presenting only his opinion and to assure the employee that Brannon himself did not believe the company would resort to such tactics, Brannon "spoke as a member of management, who was in a position to hear higher management's expressed intentions," and that through Brannon, the company "was threatening to punish the Washington plant employees with plant closure and discharge." J.A. 79.

We considered a virtually identical situation in *Avecor, Inc. v. NLRB*, 931 F.2d 924 (D.C.Cir.1991). There, answering an employee's question regarding the impact of unionization, a supervisor stated that the Union "would cause the company to close the doors.'" *Id.* at 931 (quoting ALJ Decision at. 8). In a decision that "[gave] us pause," the ALJ found the supervisor's remark to have threatened reprisals. *Avecor*, 931 F.2d at 932. As we pointed out, the evidence showed nothing more than that "one supervisor, on one occasion, in response to a direct question, in the hearing of one employee, said that the plant would close if the union were elected." *Id.* Warning that it "skirt[ed] the outermost boundaries of our deference," we nevertheless deferred to the ALJ's conclusion. *Id.* Perceiving no principled way to distinguish *Avecor*, and warning that the facts of this case—a low-level supervisor threatening a single employee who apparently did not even believe the threat was made seriously—again

push our deference to its limit, we uphold the Board's conclusion that Brannon's statement violated the Act. Because we affirm the Board with respect to Brannon's statement, we have no need to address the ALJ's separate finding that GE manager Richard Young's statements about discontinuing twelve-hour shifts violated the Act. *See General Elec. Co.*, 321 N.L.R.B. 662, n. 7, 1996 WL 392656 (1996) (declining to address same issue).

### Temporary Layoffs

■ In response to Union claims that a Union victory would improve workers' job security, GE distributed three handbills raising the possibility of temporary layoffs. Captioned "The Score Card," the first handbill contains two columns of text. The left column reads:

> *[The Union] Stands To Gain:* $182,000 per year. *You Get: Temporary Layoffs;* The obligation to pay dues or agency fees every month for the rest of your working life; All the obligations of union membership in the union constitution and by-laws; Super–Seniority for Union Officers; Possible Strikes.

J.A. 28 (emphasis added). The right column reads: "*What You Have At Risk:* Non-exempt status; Prescription Drug Card; Taxi Allowance; Meal Tickets; 20 Sick Days and 5 Personal Days; Salary Continuation for Sick Leave; 2% Vacation Pay; 11th Paid Holiday; General Pay Increases for union-free employees." *Id.* The bottom of the handbill reads, "*The UE Doesn't Add Up!* You Be The Judge! Vote for the Future. VOTE NO!" *Id.*

The second handbill, captioned "Temporary Layoffs? Yes!!," reproduces a Union bulletin sent to members of a unionized GE plant in Erie, Pennsylvania, warning that "[m]any buildings will be affected by temporary L.O.W. [lay off work]." J.A. 29. Appearing at the bottom of the handbill is this question: "What is the UE telling you about temporary [layoffs] now? It happens in Erie and could happen at the Washington Site if you vote for the UE." J.A. 29.

Captioned at the top and bottom "Don't Be Fooled ... Demand the Facts!!", the third handbill reads:

> Have you ever been sent home because your production line is not running or your job is temporarily stopped? *Then why would you want to start now?* The UE says temporary layoffs don't occur. If this is true, then why are temporary layoffs frequently referred to in the UE–GE national contract?

J.A. 30. The right side of the handbill reproduces the National Agreement's provisions dealing with temporary layoffs.

The ALJ found that each handbill violated the Act. We agree, although the issue is close. As General Electric points out, the company's handbills discussing temporary layoffs responded to Union statements about job security, including one statement, made in a Union videotape shown to employees, that Union members would face no temporary layoffs. *See* J.A. 1271 (Test. of Richard Young). As we recognized in *Crown Cork*, a company's right to free speech includes the right to respond to Union claims about job security in unionized plants. *Crown Cork*, 36 F.3d at 1134. Although GE's references to the National Agreement could be viewed as this sort of "defensive" campaigning, *see id.*, the defensive character of Crown's letter was not what ultimately protected it under the Act. Crown's letter was protected because it was "supported by objective fact." *Crown Cork*, 36 F.3d at 1135. In accordance with *Gissel*, 395 U.S. at 618, 89 S.Ct. at 1942, Crown's letter sounded "themes of competition and consciousness of cost," emphasizing that " 'union or no union,' " if the company could continue to provide its customers with quality products at reasonable prices, employees' jobs would be secure. *Crown Cork*, 36 F.3d at 1135 (quoting employer letter). This link to objective circumstances beyond the employer's control distinguishes *Crown Cork*'s letter from GE's handbills, which nowhere explain the potential for temporary layoffs in terms of competition or cost-saving devices. The handbills simply threaten temporary layoffs.

Inclusion of the National Agreement's temporary layoff provisions in one of the handbills does not insulate them from challenge. Going further than simply pointing out that the National Agreement contains procedures for temporary layoffs, the handbills threaten layoffs if the Union wins the election. Moreover, the handbills have the same sort of cumulative impact we found troubling in *Allegheny Ludlum*, threatening that if the Union wins, employees will "get" temporary layoffs (the "Score Card" handbill), that temporary layoffs "could happen" (the "Temporary Layoffs? Yes!!" handbill), and that employees "would [not] ... want to start" being laid off (the "Don't Be Fooled" handbill). As in *Allegheny Ludlum*, these statements combine to create the threat that General Electric would temporarily lay off employees simply because the employees chose to unionize, rather than because of the likely economic consequences of unionization. *See Allegheny Ludlum*, 104 F.3d at 1367. Especially in light of the deference we owe the Board, we agree that the handbills violated the Act by threatening reprisals in the form of temporary layoffs. *See Gissel*, 395 U.S. at 620, 89 S.Ct. at 1943 (a "reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship") (citing *NLRB v. Virginia Elec. & Power Co.*, 314 U.S. 469, 479, 62 S.Ct. 344, 349, 86 L.Ed. 348 (1941)).

**Threat of Strikes**

■ Titled "The Real QUESTION," a fourth handbill says:

> You know the union's position on 12–hour shifts, wages, benefits ... You know the company's position on these very same issues ... The company and the union organizers are MILES APART! Are you willing to see this Site possibly become another victim in *long, bitter negotiations?* Are you willing to face the possibility of a *long and ugly strike?* VOTE NO!

J.A. 31. According to the ALJ, this handbill violated the Act because it "implie[d] that the employees' *only* way of retaining [certain] benefits and conditions of employment would be by engaging in 'a long and ugly strike.' " J.A. 83 (emphasis added); *see also id.* (handbill "suggest[ed] that the employees faced

*futile* bargaining and an *inevitable* strike" if they voted for the Union) (emphasis added).

As in the case of Smith's speech, the ALJ erred by converting a possibility into a certainty, then declaring it a violation of the Act. In other cases, moreover, the NLRB has held that statements nearly identical to GE's were lawful. In *UARCO, Inc.*, 286 N.L.R.B. 55, 76–79, 1987 WL 89964 (1987), the Board found no problem with the employer's statements that "[t]he UAW has a long and tragic record—right here in Kentucky—of forcing lengthy, vicious and destructive strikes. . . . If you have friends or relatives at UARCO, please urge them to vote 'NO' this Thursday! For their own sake," and urging employees not to "let this outside union force you and your Company into a knock-down and drag-out fight!" "Mere references to the possibly negative outcomes of unionization," the Board ruled, "do not deprive [a company's] materials of the protections of section 8(c)." *Id.* 286 NLRB at 58. The Board reached the same conclusion in *Coleman Co.*, 203 N.L.R.B. 1056, 1970 WL 5627 (1970), where a company manager told employees that "a vote for the [Union] would put us back to the bargaining table which is a long and expensive process, and who knows, we might wind [up] in another strike." Because Coleman "merely state[d] that the Union might elect to strike to enforce its demands, and in no way convey[ed] the impression that action will be taken by the Employer to cause a strike," the Board found its remarks lawful. *Id.*

The ALJ made no attempt to distinguish the "Real Question" handbill from the statements the Board found lawful in *UARCO* and *Coleman.* Although we perceive no way to distinguish these cases, *but see, e.g., Chauffeurs Local 633 v. NLRB*, 509 F.2d 490, 496 (D.C.Cir.1974) ("employer assertions that 'serious harm' will result from unionization are generally not an unfair labor practice while assertions that the employer will 'bargain from scratch' are unfair labor practices"), because we are loath to preclude the Board from explaining apparent departures from precedent, we will remand this finding to the Board for reconsideration in light of *UARCO* and *Coleman. See Daily News v. NLRB*, 979 F.2d 1571, 1576 (D.C.Cir.1992)

(where Board appeared to have "altered course" from prior precedent without explanation, court remanded to Board for further consideration).

## III

■ Two weeks before the election, plant manager Smith ordered 1100 acrylic desk clocks for all plant employees, approximately half of whom would have been in the bargaining unit the Union sought to represent. Before distributing the clocks, Smith issued the following instructions to his managers:

What I would like to see happen is each clock is hand carried by a team manager, supervisor, or section manager, etc. to an employee with a hand shake and a thank you.

. . . . Now, we'll need to explain our reason for this reward and tell people what to say.

Reason—Theme of Pride in Past and Vision for the Future is carried forward.

This past year has been a difficult one because of economy and change. The organization has done well through everything and has shown the ability to adapt to change, get involved and continuously improve. Our performance trend is positive and we'd like to thank people for their efforts. . . . Our customers and the business is counting on us.

. . . . To personally cover everyone will take some time. I would prefer not to do a mass, impersonal handout—we'd lose some of the real reason for the reward.

. . . . Let's do it—the sooner the better, it must be well communicated up front.

J.A. 761. After the Union lost the election and filed its objections with the NLRB, management distributed the clocks.

■ The NLRA prohibits employers not just from threatening employees who support unions, but also from granting benefits to employees "with the express purpose of impinging upon [employees'] freedom of choice for or against unionization. . . ." *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964); *see also Medo Photo Supply Corp. v. NLRB*,

321 U.S. 678, 686, 64 S.Ct. 830, 834, 88 L.Ed. 1007 (1944) ("The action of employees with respect to the choice of their bargaining agents may be induced by favors bestowed by the employer as well as by his threats or domination."). "The danger inherent in well-timed increases in benefits," the Supreme Court said in *Exchange Parts,* "is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." *Exchange Parts,* 375 U.S. at 409, 84 S.Ct. at 460; *see also Skyline Distrib. v. NLRB,* 99 F.3d 403, 407 (D.C.Cir.1996); *St. Francis Fed. of Nurses v. NLRB,* 729 F.2d 844, 850 (D.C.Cir.1984). As we have held, *General Teamsters Local 992 v. NLRB,* 427 F.2d 582, 586 (D.C.Cir.1970) (citing *Northwest Eng'g Co.,* 148 N.L.R.B. 1136, 1145 (1964)), even post-election benefits fall within section 8(a)(1)'s prohibition if given while objections to the election remain pending, precisely what happened in this case; although Smith ordered the clocks before the election, they were not given to employees until after the election while the Union's objections were still pending.

The record contains sufficient evidence to support the ALJ's finding that the gift violated the Act. The ALJ emphasized the timing of the order and the one-on-one method of distribution, finding both suspicious, and we give " 'substantial deference' " to the ALJ's inferences of impermissible motive. *Laro Maintenance Corp. v. NLRB,* 56 F.3d 224, 229 (D.C.Cir.1995) (quoting *Gold Coast Restaurant Corp. v. NLRB,* 995 F.2d 257, 263 (D.C.Cir.1993)). The ALJ also credited the testimony of an employee at another General Electric plant who said a Washington plant manager told him and other workers that the gift to Washington employees was "to show there were no hard feelings" stemming from the election. J.A. 920.

## IV

An employee at the Washington plant since 1987, Fernando DaCosta supported the Union visibly and vocally. Appearing as a witness for the General Counsel during the early stages of the administrative hearings, DaCosta authenticated several of GE's anti-Union handbills and described the company's pre-election meetings. Ten months later—over a year and a half after the election—a co-worker accused DaCosta of intentionally slowing production one day in early October 1993. According to the co-worker, DaCosta narrowed the "feeding strips" on his mill, which in turn caused Kathy Carr, an employee operating a machine which sent liquid plastic to DaCosta's station, to slow her pace. Investigating these charges, GE managers obtained a written statement from Carr that DaCosta had indeed narrowed the feeding strips for no apparent reason. When confronted with this charge, DaCosta told his supervisors that he had information about the alleged slowdown but that it was "part of his defense." J.A. 93. The company fired him.

 Although section 8(a)(3) of the NLRA prohibits discharging workers because of union activity, 29 U.S.C. § 158(a)(3), employers may "apply their usual rules and disciplinary standards to a union activist just as they would to any other employee." *NLRB v. Wright Line,* 662 F.2d 899, 901 (1st Cir.1981); *see also NLRB v. Transportation Mgt. Corp.,* 462 U.S. 393, 398, 103 S.Ct. 2469, 2472–73, 76 L.Ed.2d 667 (1983). The NLRB General Counsel bears the burden of demonstrating by a preponderance of the evidence that " 'antiunion animus contributed to the employer's decision to discharge an employee.' " *Avecor,* 931 F.2d at 928 (quoting *Transportation Mgt. Corp.,* 462 U.S. at 395, 103 S.Ct. at 2471). If the General Counsel makes such a showing, the employer may avoid an unfair labor practice finding by establishing that it would have fired the employee even if he or she had not been involved with the union. *Transportation Mgt. Corp.,* 462 U.S. at 402–03, 103 S.Ct. at 2474–75; *see also Parsippany Hotel Mgt. Co. v. NLRB,* 99 F.3d 413, 422–23 (D.C.Cir.1996).

 Finding that the General Counsel failed to prove that DaCosta's firing was motivated by anti-union animus, the ALJ, affirmed by the Board, ended his inquiry at the first step of this analysis. In view of the supervisors' testimony, as well as employee

Carr's signed statement, the ALJ's conclusion was rational and supported by substantial evidence. *See District 65, Distrib. Workers v. NLRB,* 593 F.2d 1155, 1164 (D.C.Cir. 1978) (Board's determination that no violation of Act occurred must be upheld " 'unless it has no rational basis' ") (quoting *ILGWU v. NLRB,* 463 F.2d 907, 919 (D.C.Cir.1972)). Although Carr later attempted to repudiate her signed statement, the ALJ discredited her testimony, relying instead on the supervisors' testimony. We will not disturb credibility findings unless they are " 'hopelessly incredible' or 'self-contradictory,' " *Teamsters Local Union No. 171 v. NLRB,* 863 F.2d 946, 953 (D.C.Cir.1988) (quoting *Conair Corp. v. NLRB,* 721 F.2d 1355, 1368 (D.C.Cir.1983)), a standard the ALJ's findings in this case fall far short of meeting. Moreover, because DaCosta was fired almost two years after the election and ten months after he testified, his firing did not follow the election or proceedings so closely as to be remotely suspect. *See Parsippany Hotel Mgt. Co.,* 99 F.3d at 422; *see also Yesterday's Children, Inc. v. NLRB,* 115 F.3d 36, 48 (1st Cir.1997) (timing of reprimand, coming soon after protected activities, "raise[d] suspicions").

## V

■ Responding to an employee's question the day after DaCosta's firing, supervisor Michael Huff said that he "didn't want to see any petitions" protesting DaCosta's discharge because it "wouldn't do any good." J.A. 1527 (Test. of James Cogar). Two weeks later, a different GE supervisor, James Eaton, told another employee that there had been complaints that the employee had been talking with warehouse workers about DaCosta's discharge, and that he "wasn't allowed to go [to the warehouse] and talk about Fred DaCosta anymore." J.A. 1541 (Test. of Carl Yates).

■ The ALJ found that Huff's statements violated section 8(a)(1) because they prohibited employee protest of DaCosta's discharge. Emphasizing Huff's statement that petitions "wouldn't do any good," GE argues that Huff was not prohibiting employees from filing petitions, but simply expressing his view that petitions would be futile. We disagree. Huff's statement that he "didn't want to see any petitions," together with Eaton's warning to another employee against discussing DaCosta's discharge, supports the ALJ's finding of a section 8(a)(1) violation. To be sure, DaCosta's firing did not violate the NLRA; but section 8(a)(1) prohibits employers from discouraging employees from talking about another worker's discharge and circulating protesting petitions, no matter the reason for the discharge. *Westinghouse Elec. Corp.,* 277 N.L.R.B. 136, 137, 1985 WL 46034 (1985) (overturning ALJ's finding of discriminatory discharge, but concluding that employees had been unlawfully discouraged from protesting employee's discharge).

## VI

We vacate the Board's findings that the company's comments on the eleventh holiday and two percent vacation pay and Smith's speech violated the Act. Regarding the Board's finding that the company's "Real Question" handbill violated the Act, we grant the company's petition and remand to the Board for reconsideration in accordance with this opinion. The company's petition is denied in all other respects. The Union's petition for review of the Board's dismissal of its challenge to DaCosta's termination is denied.

*So ordered.*