US AIRWAYS, INC., Appellant,

v.

NATIONAL MEDIATION BOARD
and Communications Workers of
America, AFL–CIO, Appellees.

No. 98–5435.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 3, 1999.

Decided May 28, 1999.

Robert A. Siegel argued the cause for appellant. With him on the briefs was Tom A. Jerman.

Bruce G. Forrest, Attorney, United States Department of Justice, argued the cause for appellee National Mediation Board. With him on the brief were Frank W. Hunger, Assistant Attorney General at the time the brief was filed, William Kanter, Deputy Director, and Ronald M. Etters, General Counsel, National Mediation Board. Theodore C. Hirt, Attorney, United States Department of Justice, entered an appearance.

James B. Coppess argued the cause for appellee Communications Workers of America, AFL–CIO. With him on the brief were Daniel M. Katz, Larry Engelstein, and Marsha S. Berzon.

Before: SILBERMAN, WILLIAMS, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The National Mediation Board (NMB) found that U.S. Airways had interfered with its employees' free choice in a union representation election, and issued an order setting aside the results of that election (which the union had lost) and prescribing a re-run election (which the union won). US Airways challenged the Board's order in the district court on First Amendment grounds, requesting that the results of the re-run election be set aside, but was rebuffed. We reverse.

## I.

The Communications Workers of America (CWA) failed in the first election to garner the votes necessary to represent the passenger service employees of U.S. Airways. The union saw its defeat as the product of a coercive anti-union campaign waged by the carrier's management leading up to, and during, the representation election. Pursuant to § 2, Ninth of the Railway Labor Act, the union requested that the Board "investigate" the "representation dispute" and "utilize any . . . appropriate method of ascertaining the names of [the employees'] duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier." 45 U.S.C. § 152, Ninth.

No one disputes the underlying facts found by the Board in its investigation. For some time prior to the representation election, an institution known as the "employee roundtable" was a key feature of management's relationship with the several categories of non-represented passenger service employees. The roundtables, while focusing on operational and other issues in their periodic meetings, also provided a forum for occasional discussion and alteration of U.S. Airways' employment policies. The impact has been real. Modifications to the carrier's rules governing vacation scheduling, supervisors' disciplinary authority, and overtime were only a few of the changes made from 1991–95.

In early 1996, a new management team announced the formation of a company-wide "System Roundtable," an umbrella entity unifying the existing roundtables that would continue, in the words of one executive officer, to provide a forum for "issues affecting employees." The System Roundtable continued the tradition of its constituent bodies, implementing changes to the carrier's policies governing tardiness and trading of shifts among employees, and also delegated to several "task forces" the responsibility to study other policies. The most notable of these task forces was assigned the job of proposing changes to the carrier's apparently widely despised policy governing paid days off for vacation and sick days.

Between the Board's authorization of the election in November 1996 and the ballot count on January 30, 1997, U.S. Airways' management highlighted the above described employment policy changes and the potential for future progress on the matters under study by the task forces. In informational newsletters, telephone hotlines, and meetings, management communicated to the employees that the informal management-employee relationship embodied in the roundtables was inconsistent with union representation: "Electing CWA would force the company to eliminate face-to-face policy making between management and employees at a time when we are beginning to make real progress. Labor laws require employees to deal exclusively with the union on issues of employment policy."

After reviewing these facts, the Board's order set forth five "initial standards" viewed as indicative of a carrier's interference with employee freedom of choice in the context of a workplace in which roundtables (also called employee committees) are present.

1) The establishment of a committee at any time after the carrier becomes aware of a labor organization's organizing efforts;

2) A material change, or a carrier representation of such a change during the critical period in the purpose or activities of a pre-existing committee;

3) The use of a pre-existing committee to expand employee benefits during the critical period (the continuation of existing benefits is a prerequisite of a fair election);

4) Carrier campaigns which indicate a pre-existing committee is, or should be, a substitute for the collective bargaining representative;

5) Carrier campaigns which indicate that the certification of a labor organization as the representative of the employees will lead to the termination of a pre-existing committee.

*US Airways*, 24 N.M.B. 354, 385–86 (1997). The Board determined that the carrier's activities ran afoul of each of these five factors: the carrier had established a new roundtable during the critical period; represented to the employees that pre-existing committees had been materially changed so as better to address employment practices; used the roundtables to accomplish the recent changes in attendance and shift-trading policies and the creation of the task forces; portrayed the roundtables as an alternative to union representation; and predicted that the election of the union would result in the elimination of the roundtable process. *See id.* at 388. The Board concluded that "[b]ased upon the totality of the circumstances in this case, ... the laboratory conditions required for a fair election were tainted." *Id.* at 393.

The Board ordered a re-run election, making clear that "[t]he Carrier is not permitted to influence, interfere [with] or coerce employees in any manner ... in the upcoming election." *Id.* at 396.[1] The car-

rier, after failing to persuade the Board to stay its order pending a motion for reconsideration, filed a complaint in district court, along with an application for a temporary restraining order barring enforcement of the Board's order. Relying in part on the Board's representation at the TRO hearing that "[i]f the election goes forward, and then a decision is issued by the court that the board's decision is invalid, the election will be null and void," the district court denied the application. *See U.S. Airways, Inc. v. NMB*, Civ. Act. No. 97–1508, Mem. Order at 3 (D.D.C. July 3, 1997) ("If at some point, the provisions of that Order are held to violate either the statute or the Constitution, the election will be set aside.").

US Airways, its request for a TRO denied, complied with the Board's order. The carrier understood the order's fourth and fifth factors to bar it from advocating the roundtables as an alternative to union representation and from predicting that election of the union would result in the disbanding of the roundtables. So U.S. Airways' management remained silent on these matters. The union won the re-run election by a slim margin: the ballot count on September 29, 1997, revealed that of the 8,772 eligible voters, 4,773—or roughly 54%—cast ballots in favor of CWA. The NMB soon thereafter certified CWA as the bargaining representative for the carrier's passenger service employees. Still awaiting a decision by the district court on the merits of its complaint, U.S. Airways amended its complaint to take account of the now completed re-run election: "Because U.S. Airways' speech was *unconstitutionally restrained during the rerun election by the Board's Order ...*, U.S. Airways seeks an order setting aside the election and the certification of CWA."

---

**1.** The Board's order also required U.S. Airways: 1) to post and mail to all employees a notice indicating that the Board had found that U.S. Airways had interfered with and coerced the employees' choice of a representative; and 2) to provide the union with a list of employee home addresses. *See U.S. Airways*, 24 N.M.B. at 393. US Airways unsuc-

cessfully challenged these aspects of the order in the district court on the ground that they exceeded the Board's statutory powers. *See U.S. Airways, Inc. v. NMB*, Civ. Act. No. 97–1508, Mem. Op. at 10–14 (D.D.C. July 21, 1998). As U.S. Airways does not renew these contentions before us, we express no view on them.

Supplemental Verified Complaint for Declaratory and Injunctive Relief ¶ 7 (filed Mar. 27, 1998) (emphasis added).

The district court ultimately rejected the carrier's constitutional arguments, granting the Board's motion for summary judgment. *US Airways, Inc. v. NMB*, Civ. Act. No. 97–1508, Mem. Op. (D.D.C. July 21, 1998). The court rejected the carrier's analogy to cases, including *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), recognizing an employer's First Amendment right to express its views on unionization prior to a representation election. Those cases, the district court observed, arose in the context of the National Labor Relations Act, not the Railway Labor Act, and were inapplicable because "[t]he role of employers in representation elections governed by the RLA is more limited than the activities permitted employers under the NLRA." Mem. Op. at 14. Alternatively, the district court assumed that the NLRA caselaw does apply to the RLA context, and held that U.S. Airways' activities are not protected under that framework.

## II.

The carrier seeks the invalidation of the results of the rerun election. Its arguments in support are two-fold: the carrier first submits that the Board's order unconstitutionally penalized it for the expressive activity in which it engaged prior to the first election; alternatively, the carrier

claims that the order unconstitutionally restricted its expression during the re-run election period. We begin, for reasons that will become apparent, with the latter contention.

■ Normally, district courts lack jurisdiction to review certification decisions rendered by the NMB within its scope of authority under § 2, Ninth of the RLA. *Railway Labor Executives' Ass'n v. NMB*, 29 F.3d 655, 662 (D.C.Cir.) (en banc); *id.* at 673 (Randolph, J., concurring, joined by Mikva, C.J., Wald, J., Edwards, J., and Sentelle, J., together comprising a majority of the court), *amended* 38 F.3d 1224 (D.C.Cir.1994) (en banc).[2] But this presumption of nonreviewability falls away if the complainant makes a " 'showing on the face of the pleadings that the certification was a gross violation of the [RLA] or that it violated the constitutional rights of an employer, employee, or Union.' " *Professional Cabin Crew Ass'n v. NMB*, 872 F.2d 456, 458 (D.C.Cir.1989) (quoting *International Ass'n of Machinists v. Trans World Airlines, Inc.*, 839 F.2d 809, 811 (D.C.Cir.), *amended* 848 F.2d 232 (D.C.Cir. 1988)) (alteration in original). Once an employer (or employee or union) pleads a violation of its constitutional rights or a gross violation of its statutory rights arising from an NMB order, jurisdiction depends on the merits of the argument.

■ As U.S. Airways points out, however, our approach to the two exceptions to

**2.** The ordinary presumption of non-reviewability of NMB adjudicatory decisions rendered pursuant to 45 U.S.C. § 152, Ninth stems from *Switchmen's Union of North America v. NMB*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), where the Supreme Court inferred from Congress' careful measures to preserve the neutrality and prestige of the NMB in the Board's treatment of the "explosive problem" of labor relations in the railway industry that if Congress had desired to implicate the federal judiciary, it would have said so. *Id.* at 303. Though decided prior to the enactment of the APA, which provides in relevant part that judicial review is precluded only to the extent that a statute so provides or the agency action is committed to agency discretion by law, 5 U.S.C. § 701(a), *Switchmen's* has since been

reaffirmed, *see Brotherhood of Ry. Clerks v. Association for Benefit of Non–Contract Employees*, 380 U.S. 650, 658–60, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965). We have reconciled the *Switchmen's* presumption with the APA by describing the presumption as a situation where judicial review is precluded by statute, as judicially interpreted; however, because the statute does not by its terms preclude judicial review of NMB *rulemaking* and has never been judicially interpreted to do so, the *Switchmen's* presumption does not apply outside the context of NMB adjudications pursuant to 45 U.S.C. § 152, Ninth. *See Railway Labor Executives' Ass'n*, 29 F.3d at 673 (Randolph, J., concurring, joined by Mikva, C.J., Wald, J., Edwards, J., and Sentelle, J., together comprising a majority of the court).

the presumption of non-reviewability differs somewhat. In examining a challenge predicated on the exception for a gross violation of the RLA, we take only a "peek at the merits"; that is, we limit the inquiry to "specific statutory language, without extension to 'arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide.'" *International Brotherhood of Teamsters v. Brotherhood of Ry. Clerks*, 402 F.2d 196, 205 (D.C.Cir.1968) (quoting *Brotherhood of Ry. Clerks v. Association for Benefit of Non-Contract Employees*, 380 U.S. 650, 671, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965)). The district court thought it was similarly compelled to take only a "peek at the merits" of U.S. Airways' *constitutional* challenge. That was erroneous. Although both constitutional and statutory challenges to NMB decisions should be processed by a reviewing court with dispatch given Congress' purpose in the RLA "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein," 45 U.S.C. § 151a; *see International Brotherhood of Teamsters*, 402 F.2d at 205, the "peek" framework is simply not suited to the evaluation of constitutional claims. For constitutional arguments cannot sensibly be restricted to the plain text of the clause at issue, which is what the "peek" framework would require. To be sure, we have suggested otherwise in *dicta. See Professional Cabin Crew Ass'n*, 872 F.2d at 459 ("Courts take only a 'peek at the merits' to determine if the NMB has committed an error of 'constitutional dimension or gross violation of the statute.'") (quoting *International Brotherhood of Teamsters*, 402 F.2d at 205).[3] But our only holding confirms that a court must do more than just peek. We did not reject

the constitutional claim in *International Association of Machinists* until we had "independently" satisfied ourselves, 839 F.2d at 812, that there was no authority for the proposition of constitutional law asserted by the appellants in that case. As we thus engaged in our own research in support of a complainant's constitutional challenge to an NMB decision, *but cf. Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir. 1983), *a fortiori* we evaluated the complainant's claim on its "full merits."

■ We therefore turn to the carrier's claim that the Board's order unconstitutionally restrained the carrier (prospectively) from engaging in protected expression leading up to the rerun election. US Airways submits that the order's fourth and fifth factors evince the Board's intent to find carrier interference based on speech alone, wholly apart from conduct. Such an approach, we are told, is an affront to *Gissel*'s teaching that the First Amendment allows an employer to express anti-union views (so long as threats of reprisal or promises of benefits are not imparted) and to make objective, nonmisleading predictions of the likely effects of union representation. *See Gissel*, 395 U.S. at 618; *see also, e.g., General Elec. Co. v. NLRB*, 117 F.3d 627, 630 (D.C.Cir.1997); *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1134 (D.C.Cir.1994).

■ The district court rejected U.S. Airways' reliance on the First Amendment principles announced in these cases: "*Gissel Packing*, and the other cases cited by Plaintiff are inapposite for the simple reason that they were decided under the NLRA, not the RLA, which is the statute governing this case." Mem. Op. at 14.

---

**3.** Two of our sister circuits have quoted this *dicta* approvingly, but neither has used it to evaluate a constitutional challenge to an NMB decision. *See America West Airlines, Inc. v. NMB*, 119 F.3d 772, 775 (9th Cir.1997); *Brotherhood of Maintenance of Way Employees v. Grand Trunk W. R.R. Co.*, 961 F.2d 1245, 1249 (6th Cir.1992). The Fifth Circuit has stated that jurisdiction to review a constitutional challenge to an NMB decision exists

only "where a complaining party makes a 'substantial showing' of a violation of that party's constitutional rights as a result of the Board's action." *Russell v. NMB*, 714 F.2d 1332, 1339 (5th Cir.1983) (quoting *United States v. Feaster*, 410 F.2d 1354, 1366 (5th Cir.1969) (quoting *Boire v. Miami Herald Publ'g Co.*, 343 F.2d 17, 21 (5th Cir.1965))). This formulation seems rather unhelpful.

The district court observed that "[t]he role of employers in representation elections governed by the RLA is more limited than the activities permitted employers under the NLRA," *id.*, and reasoned that "[t]he Constitution does not tolerate expression by an employer found to be specifically prohibited by an Act of Congress," *id.* at 15 (quoting *International Ass'n of Machinists v. Continental Airlines, Inc.*, 754 F.Supp. 892, 896 (D.D.C.1990)).[4]

██ ˙ Of course the First Amendment does not ebb and flow with the legislative will. Yet the force of the First Amendment has been held to vary with *context*, if not with the desires of a given Congress. For example, in *Gissel*, the Supreme Court noted that the rights of employers to express their anti-union views must be balanced with the rights of employees to collectively bargain, and explained that "any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel*, 395 U.S. at 617. Not only is a "balancing" required, the NLRB calibrates the scales. *See id.* at 620 ("[A] reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship.") (citation omitted). In an attempt to exploit this reasoning, the NMB points to two facets of the RLA that differ from the NLRA, and argues that these differences justify *less* employer protection in RLA-governed representation elections than in NLRA-governed representation elections. But the first asserted difference is irrelevant: Section 8(c) of the NLRA, 29 U.S.C. § 158(c) ("The expressing of any views … shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."), while absent from the RLA, "merely implements the First Amendment," *Gissel*, 395 U.S. at 617. And the second does not even exist: the RLA's language prohibiting employer "influence" of employees, 45 U.S.C. § 152, Third, Fourth, Ninth, while superficially broader than the NLRA's proscription of "interfer[ing] with, restrain[ing] or coerc[ing] employees," 29 U.S.C. § 158(a)(1), has been interpreted to mean pretty much the same thing, *see Texas & N.O. R.R. Co. v. Brotherhood of Ry. Clerks*, 281 U.S. 548, 568, 50 S.Ct. 427, 74 L.Ed. 1034 (1930). In short, the Board provides us with nothing to support its claim that the key characteristic of representation elections identified by the *Gissel* Court as mandating lesser-than-usual First Amendment protection of employers' expression—the economic dependence of employee on employer—should be thought of differently when that employer is a carrier governed by the RLA.

██ Thus, we must apply *Gissel* to determine whether the Board's order unconstitutionally restrained U.S. Airways' speech leading up to the re-run election. As noted, the Board set forth five factors to provide "general guidance concerning carrier actions in connection with employee committees," *US Airways*, 24 N.M.B. at 386, a clear indication of their prospective effect.

The Board has determined that the following carrier conduct regarding em-

---

4. The district court found further support in *Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants*, 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989), where the Supreme Court cautioned that "the NLRA 'cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes.'" *Id.* at 439 (quoting *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969)). This is sound advice, but clearly does not govern the situation presented here where we are interpreting not the RLA, but the First Amendment, which applies to both the RLA and the NLRA.

ployee committees [*i.e.*, roundtables] interferes with employee freedom of choice:

1) The establishment of a committee at any time after the carrier becomes aware of a labor organization's organizing efforts;

2) A material change, or a carrier representation of such a change during the critical period in the purpose or activities of a pre-existing committee;

3) The use of a pre-existing committee to expand employee benefits during the critical period (the continuation of existing benefits is a prerequisite of a fair election);

4) Carrier campaigns which indicate a pre-existing committee is, or should be, a substitute for the collective bargaining representative;

5) Carrier campaigns which indicate that the certification of a labor organization as the representative of the employees will lead to the termination of a pre-existing committee.

*Id.* at 385–86. These factors were not linked by the word "and"; nor did the Board ever suggest that more than one must be present to support a finding of carrier interference. And the Board made clear in the notice it required U.S. Airways to post that "[t]he carrier is not permitted to influence, interfere [with] or coerce employees *in any manner* in an effort to induce them to participate or refrain from participating in the upcoming election." *Id.* at 396 (emphasis added). US Airways reasonably interpreted all this to mean that any of "the following conduct" would suffice, and therefore that each of the five proscribed activities had to be avoided leading up to the re-run election.

That the fourth and fifth factors—which by their terms regulate pure speech—stand apart from the other three (and indeed from each other) simplifies the

analysis by obviating the need for us to confront the situation where an employer's otherwise protected speech becomes unprotected because the employer *also* engages in conduct tending to coerce. *See NLRB v. Virginia Elec. & Power Co.*, 314 U.S. 469, 478, 62 S.Ct. 344, 86 L.Ed. 348 (1941) ("The mere fact that language merges into a course of conduct does not put the whole course without the range of otherwise applicable administrative power. In determining whether the Company actually interfered with, restrained, and coerced its employees the Board has a right to look at what the Company has said as well as what it has done."); *see also Peter J. Schweitzer, Inc. v. NLRB*, 144 F.2d 520, 523 (D.C.Cir.1944). This is why we have chosen to focus on U.S. Airways' contention that its expression *leading up to the re-run election* was unconstitutionally restrained rather than its alternative claim that it was unconstitutionally penalized for the expression in which it engaged *prior to the initial election.* The carrier's campaign prior to the initial election was a potpourri of speech *and* conduct, and the Board's order would have to be evaluated under the theory of *Virginia Electric.*[5] We need not do so, however, because U.S. Airways does not ask that the results of the first election (which the union lost) be reinstated, only that the results of the re-run election (which the union won) be set aside. *See* Supplemental Verified Complaint for Declaratory and Injunctive Relief ¶ 7 (filed Mar. 27, 1998). That requested relief would follow from a showing that U.S. Airways' speech was unconstitutionally restrained leading up to the re-run election.

The fourth and fifth factors proscribe exactly what *Gissel* protects. Whereas the fourth factor would restrict "[c]arrier campaigns which indicate a pre-existing com-

---

5. If we applied *Virginia Electric* and determined that U.S. Airways could not constitutionally be penalized for the particular mix of speech and conduct in which it engaged prior to the initial election (perhaps because the campaign involved mostly speech and not so much conduct), we would be obliged to direct a remand to the Board for a determination whether it would reach the same result based on the conduct *alone.* That would afford U.S. Airways less than the full relief that it seeks.

mittee is, or should be, a substitute for a collective bargaining representative," *US Airways*, 24 N.M.B. at 386, *Gissel* teaches that "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit,'" *Gissel*, 395 U.S. at 618 (quoting 29 U.S.C. § 158(c)).

█ The fifth factor would forbid U.S. Airways from "indicat[ing] that the certification of a labor organization as the representative of the employees will lead to the termination of a preexisting committee." *US Airways*, 24 N.M.B. at 386. But *Gissel* shields just this sort of prediction:

> [An employer] may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control. . . . If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*Gissel*, 395 U.S. at 618. Thus, an employer is free to make objective predictions, such as that its employees will lose vacation time under the terms of the union's national agreement, *General Elec.*, 117 F.3d at 632, or that unionization will create a perception that the company is strike-prone and unreliable, leading to the loss of customers, *id.* at 633–34; *Crown Cork*, 36 F.3d at 1134–35, or that unionization will lead to prolonged bargaining between the union and the employer, *Flamingo Hilton–Laughlin v. NLRB*, 148 F.3d 1166, 1174 (D.C.Cir.1998), but not subjective predictions (*i.e.*, those lacking a connection to

objective circumstances), such as a bare assertion that temporary layoffs could occur if the union is elected, *General Elec.*, 117 F.3d at 635; *Allegheny Ludlum Corp. v. NLRB*, 104 F.3d 1354, 1367 (D.C.Cir. 1997).

Here, the objective circumstance stems from law rather than economics, but it is objective nonetheless. Where the NMB has certified a representative for a carrier's employees, the RLA imposes on the carrier the duty to "treat with" that certified representative and none other in negotiating working conditions and wages. 45 U.S.C. § 152, First, Ninth; *see Virginia Ry. Co. v. System Fed'n No. 40*, 300 U.S. 515, 548–49, 57 S.Ct. 592, 81 L.Ed. 789 (1937). The Board and appellee CWA do not dispute this basic proposition, but argue that U.S. Airways' statement that unionization "would force the company to eliminate face-to-face policymaking between management and employees" was only a half-truth given the way U.S. Airways structured its roundtables. The Board found that the roundtables primarily discussed operational issues having no relation to employment policies and only occasionally turned their attention to the latter. Appellees accordingly urge that continuation of the roundtables in their capacity as a forum for discourse on operational issues would be entirely consistent with the strictures of 45 U.S.C. § 152, Ninth, and hence it was misleading for the carrier to represent to its employees that the roundtables would have to be shut down in all respects.

To be sure, U.S. Airways might have explained more precisely just what it was about the roundtables that was inconsistent with union representation. "But if unions are free to use the rhetoric of Mark Antony while employers are limited to that of a Federal Reserve Board chairman, . . . the employer's speech is not free in any practical sense." *Crown Cork*, 36 F.3d at 1140 (holding protected an employer's prediction that unionization would increase costs, risking the loss of cost-sensitive pro-

jects and consequent layoffs, notwithstanding employer's failure to emphasize that the loss of such projects was only a risk and not an absolute certainty). It was enough for U.S. Airways to connect its prediction that the roundtables would be disbanded to the "labor laws," *US Airways*, 24 N.M.B. at 370, 371, 375, especially given the history of the fleet service employees' roundtable, which had been disbanded after those employees had unionized, *id.* at 359; s*ee Crown Cork*, 36 F.3d at 1141 (employer's prediction that unionization would cause loss of employee benefits under the union's ambiguous master agreement supported by past authoritative interpretations of the master agreement in similar circumstances).

In concluding that the Board's order unconstitutionally restrained U.S. Airways' speech leading up to the re-run election, we are mindful of the Supreme Court's admonition in *Gissel* that "an employer, who has control over [the employer-employee] relationship and therefore knows it best, cannot be heard to complain that he is without an adequate guide for his behavior." *Gissel*, 395 U.S. at 620. Here, there was not a lack of guidance in any sense. Rather, the order exactly (and unconstitutionally) informed U.S. Airways of what sort of expression was proscribed.

### III.

Appellee CWA (intervenor below) raises additional arguments not presented by the Board. The union suggests that U.S. Airways was not really restrained by the Board's order; it remained silent before the re-run election for tactical reasons. If the union lost, U.S. Airways would get its desired result with no fear that the Board might again order a new election; if the union won, U.S. Airways would invoke its unconstitutional restraint argument to get a second bite at the apple. The union points out that U.S. Airways never once presented its "chill" argument to the Board, and argues that this failure to exhaust administrative remedies is fatal. The union believes U.S. Airways should have sought a clarifying opinion from the NMB as to the order's prospective effect.[6]

However, the carrier made its request for a TRO, predicated in part on its chill theory, after the Board had issued its order and *before* the re-run election was held, so it was hardly sitting on its claim. At that juncture, the carrier surely wished to engage in expression proscribed by the fourth and fifth factors of the Board's order, and was concerned that doing so might result in an even more severe sanction—as a repeat offender—than a re-run election on the Board's standard ballot. For as the Board has explained, the more egregious an employer's behavior, the more severe the penalty. *See U.S. Airways*, 24 N.M.B. at 381–83 (citing *Laker Airways, Ltd.*, 8 N.M.B. 236 (1981) (re-run election on "yes" or "no" ballot where the majority of votes cast would determine the outcome); *Key Airlines*, 16 N.M.B. 296 (1989) (rerun election on ballot where certification would result unless a majority of eligible voters voted against the union); *Sky Valet*, 23 N.M.B. 276 (1996) (certification based on a check of authorization cards)); *see also* 45 U.S.C. § 152, Tenth (providing for NMB referral of a carrier's willful violation of 45 U.S.C. § 152, Fourth to the United States attorney for prosecution as a misdemeanor). Such possibilities, in conjunction with the order's fourth and fifth factors, created a more than cred-

---

**6.** The union makes the quite valid observation that First Amendment chilling effect claims are apparently always advanced when the claimant has an interest in engaging in speech *in the future, see, e.g., Reno v. ACLU*, 521 U.S. 844, 871–72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *Chamber of Commerce v. FEC*, 69 F.3d 600, 603–04 (D.C.Cir.1995), whereas here U.S. Airways contends only that its speech was chilled *in the past,* identifying its present injury in the results of the re-run election. We admit this is a unique situation, but we see no reason why an injury flowing from the suppression of one's speech in the past (if only by chilling) should not be remediable. In any event, U.S. Airways undoubtedly has an interest in engaging in expression in future elections (including the second re-run election that will be held if the results of the first re-run election are set aside).

ible threat that the carrier's speech would be suppressed by subsequent application of the order, thereby conferring standing on the carrier to make the chill argument. *See Skaggs v. Carle,* 110 F.3d 831, 836–37 (D.C.Cir.1997) (citing *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)).

If U.S. Airways had been unable to invoke its chill argument later to reverse a union victory (perhaps on the very ground that the union advances that one who lacks an ongoing interest in speaking cannot be chilled), it would have been irreparably harmed. Responding to this concern at the TRO hearing, the Board's counsel represented to the district court that "[i]f the election goes forward, and then a decision is issued by the court that the board's decision is invalid, the election will be null and void. The situation will be rectified down the road. They will not be stuck with a union representative if the board's order is struck down." And the district court, discussing the irreparable harm issue in the course of denying the requested TRO, specifically noted that "[i]f at some point, the provisions of that Order are held to violate either the statute or the Constitution, the election will be set aside." Mem. Order at 3.

We assume this is why only the union, and not the Board, is advancing the exhaustion argument. The Board's failure to join undermines the union's claim, since the only litigant with an institutional interest in such an exhaustion requirement has not argued for it, *see Cutler v. Hayes,* 818 F.2d 879, 891 n. 95 (D.C.Cir.1987) (rejecting an intervenor's claim that appellants had failed to exhaust administrative remedies in part because the agency did not press the issue); *but cf. Coalition for the Preservation of Hispanic Broadcasting v. FCC,* 931 F.2d 73, 76 (D.C.Cir.1991) (noting that the exhaustion doctrine concerns economy not only of agency but also of judicial resources and that a court may in its discretion raise the issue *sua sponte*), and there is no suggestion that any failure to meet such a requirement (if one exists) strips us of jurisdiction, *see Darby v.*

*Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). In any event, it would have been futile for U.S. Airways to seek a clarifying opinion. While we treat such a credible First Amendment chilling effect claim as satisfying Article III's case or controversy requirement, *see Skaggs,* 110 F.3d at 836–37, the Board has rejected just such a claim as an impermissible request for an "advisory opinion," *America West Airlines,* 17 N.M.B. 226, 233 (1990).

\* \* \*

We accordingly reverse the district court's grant of summary judgment in favor of the NMB and remand the case to the district court with instructions to remand in turn to the NMB to set aside the results of the re-run election and for further proceedings not inconsistent with this opinion.

*So ordered.*