**HORIZON AIR INDUSTRIES, INC.,**
a Washington Corporation,
Plaintiff–Appellant,

v.

**NATIONAL MEDIATION BOARD,**
Defendant–Appellee,

**International Brotherhood of Teamsters, Defendant– Intervenor–Appellee.**

No. 98–35767.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 2000

Filed Nov. 21, 2000

Michael R. Scott (argued); Eric D. Lansverk, Hillis Clark Martin & Peterson, Seattle, Washington, for the plaintiff-appellant.

Frank W. Hunger, Assistant Attorney General, Washington, D.C.; Katrina C.

Pflaumer, United States Attorney, Seattle, Washington; William Kanter, Alfred Mollin, Robert Kamenshine (argued), Department of Justice, Washington, D.C., for the defendant-appellee.

Robert H. Gibbs, Gibbs Houston Pauw, Seattle, Washington; Edgar N. James, Marie Chopra, James & Hoffman, Washington, D.C.; William R. Wilder (argued), Baptiste & Wilder, P.C., Washington, D.C., for the intervenor-defendant-appellee.

Before: BROWNING, B. FLETCHER, and GOULD, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge:

This case arises out of a representation dispute involving pilots at Horizon Air Industries ("Horizon"), a regional airline. Following an organizing campaign by the International Brotherhood of Teamsters ("IBT") in 1995, the National Mediation Board ("NMB" or "Board") conducted a representation election. Horizon's pilots failed to approve the IBT as their bargaining representative. The IBT filed a complaint with the NMB, alleging interference by Horizon in the election process. After investigation, the NMB found that Horizon had interfered in the election and ordered a new election. Horizon was required to post a notice concerning the finding of interference, and was ordered to refrain from further interference during the second election. In late 1997, the pilots cast their second set of ballots and approved the IBT as their representative. Horizon filed suit in the Western District of Washington, alleging that the NMB had exceeded its authority under the Railway Labor Act ("RLA") and infringed the carrier's First and Fifth Amendment rights. The district court granted summary judgment in favor of the NMB and dismissed the case with prejudice. Horizon timely appealed.

Reviewing de novo, *see Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir.1999) (en banc), we find that the NMB acted within its statutory authority and did not violate Horizon's constitutional rights. We therefore affirm the district court.

I.

*The PIREPS Program*

In 1984, Horizon Air established a "lead captain program" with the stated goal of improving communication between the carrier's management and its pilots. The program's main body was a committee elected by and made up of non-management pilots. While the committee had a consultative role in Horizon's decisions concerning the pilots, this role remained informal, and Horizon unilaterally made all decisions concerning working conditions, rates of pay, and work rules.

In 1988, management-pilot relations began to change. First, Horizon placed all of its policies concerning pilots into a free-standing document entitled the "Flight Crew Policy Handbook" ("FCPH"). Second, the lead captain program was renamed the "Pilot Representatives Program" or "PIREPS." These changes inaugurated a new era of relations between the company and its pilots.[1]

Representatives from PIREPS and the Horizon management signed an agreement making the FCPH a binding document with an effective term of September 1, 1988 through September 1, 1990. Horizon told the pilots that the FCPH could be amended only by agreement of the management with approval from a majority of the pilot representatives. In 1990, the PIREPS program was formalized through

---

1. From its inception, the PIREPS program was funded by Horizon. This support included production costs for the printing of a newsletter, compensation for elected pilot representatives, and administrative support. PIREPS also collected some funds from its constituency; monies gathered directly from the pilots were used to compensate an attorney who provided advice on the binding nature of the FCPH.

the adoption of bylaws and procedures for election of officers, appointment of committees, and approval of changes to the FCPH. In 1990, a new FCPH was negotiated by the management and PIREPS and was ratified by the pilots according to the bylaws. This FCPH expired on September 1, 1993. A newly negotiated FCPH was ratified by the pilots in December 1993. The 1993 FCPH was set to expire in 1998, with an earlier expiration, 1996, set for specific sections of the agreement concerning compensation and benefits.

*The Resignation of the PIREPS Board and the IBT Campaign*

IBT initially campaigned for unionization of Horizon's pilots in late 1993 and early 1994. The campaign was abandoned in mid–1994, and did not start again until 1995. By that time, the pilots were dissatisfied with the way the airline was handling a number of changes that affected them directly. Horizon had undergone rapid expansion and was suffering from staffing shortages, particularly in its pilot division. The shortage put pressures on Horizon pilots, who experienced scheduling difficulties, safety concerns, and reserve duty problems. In early 1995, the PIREPS committee began to meet with Horizon management to discuss these concerns. Although the PIREPS newsletter presented the initial meeting as relatively successful, relations between the PIREPS board and Horizon's management deteriorated quickly.

On March 1, 1995, a member of the PIREPS board sent a letter to the pilots disclosing the results of a survey PIREPS had conducted concerning reserve duty. Additional meetings between the PIREPS board and Horizon management were held on March 13 and 15, but failed to yield results. Following the March 15 meeting, the entire PIREPS board resigned. In individual resignation letters, the representatives expressed frustration with the Horizon management, explaining that the carrier was not affording the pilots sufficient attention. The letters also underscored the ineffectiveness of the PIREPS program as an institution. One letter stressed the need for a "certified bargaining representative."

The day after the group resignation, Horizon's Senior Vice President of Operations sent a letter to the pilots explaining what had happened and stating that Horizon would "facilitate" an election for a new board according to the PIREPS bylaws. In a newsletter published by the resigned PIREPS board members on March 21, the letters of resignation were printed alongside an article discussing the problems that led to the resignation. That article explored the option of joining a national union. A new PIREPS board was subsequently elected by the pilots.

In the midst of the management-pilot tension, the Teamsters re-entered the representation debate. IBT issued a newsletter on March 30, 1995, announcing the launch of a new unionization campaign. On April 3, Horizon's Senior Vice President of Operations sent a letter to the pilots stressing the carrier's commitment to improvement, and announcing a number of changes that would be implemented immediately. These changes included hiring and training to alleviate pilot shortages; increases in "premium pay" rates; lengthened rest hours; increased compensation for PIREPS members once they were elected; and the hiring of a new liaison who would work with the PIREPS board and Horizon management to implement improvements.[2]

A few weeks later, the same Horizon executive sent another letter to pilots discussing the IBT campaign. This letter described the voting process involved in a

---

2. This position was a combination of management-pilot liaison and safety officer. The NMB explains: "During the Winter of 1995, the FAA had been critical of regional airline safety and had recommended the creation of a safety officer at each regional airline. The carrier combined the [liaison] position ... with the safety director position recommended by the FAA." *Horizon Airlines,* 24 N.M.B. 458, 475 (1997).

representation dispute and corrected some "errors of fact" the carrier identified in the IBT newsletter. In response to a statement in an IBT newsletter, the executive stressed:

> You are not an 'at-will' employee, and the company cannot change wages, work rules or benefits without your agreement. Further, the [FCPH] handbook specifies procedures for discipline, complaint review and grievance, with binding arbitration to solve unresolved matters. These are exactly the same provisions found in union contracts.

On June 12, 1995, the IBT officially notified Horizon that it was conducting an organization drive; this notification listed the names of employees involved in the campaign. Horizon's recently-hired liaison/safety officer wrote a letter to the pilots on June 14, discussing the campaign. The letter situated the IBT campaign in a context of declining union membership and asserted that a national union was not in the best interests of the pilots.

Discussions between the PIREPS board and Horizon management continued into June 1995. In mid-June, Horizon informed PIREPS that the carrier was extending a temporary increase in "premium pay." A June 21 letter from the Horizon liaison addressed to pilots announced a few improvements: mandatory rest time would be approved for ten hours, and pilots would now be allowed to remove their neckties in the cockpit. A postscript to the letter included a lengthy commentary on inaccuracies in the IBT's campaign literature. The liaison emphasized once again that the FCPH is a "legally binding and enforceable document." In July 1995, Horizon continued to negotiate with PIREPS on issues such as reserve policies, 401K matching contributions, and reimbursement policies for "return overnight" expenses. Throughout the IBT campaign, the PIREPS newsletter presented articles and letters representing varying perspectives on the unionization debate.

## IBT's Application with the NMB, the Election, and the IBT's Complaint

On September 21, 1995, the IBT filed an application with the NMB claiming that there was a representation dispute concerning the pilots at Horizon Airlines. In response, Horizon management informed the PIREPS board on September 29, 1995 that it would not be able to implement any new reform proposals because the company was required to maintain the status quo during the representation dispute and election. Horizon explained that it would be able to complete improvements that were already underway. A letter from the management to all pilots was sent on September 29, explaining that Horizon would "remain 'out of the fray,' so to speak, and allow you to make your own decisions based upon facts and your own personal convictions." The letter also included the personal convictions of the writer: Horizon's Vice President for Flight Operations opined that IBT representation was not in the best interests of the pilots. In October 1995, Horizon's President explained in an interview with an in-house publication that the Teamsters should be rejected, since unions tend to create an " 'us versus them' mentality."

Following its investigation, the NMB found that there was indeed a dispute and authorized a mail-in ballot election. A number of other letters were sent by the Horizon management to the pilots during the run-up to the election. These letters stressed that while it was the pilots' choice whether to unionize or not, the management felt it was against the interests of the pilots and Horizon as a whole to have the IBT acting as a bargaining representative.

On January 19, 1996, the ballots were counted. Of 594 eligible voters, 240 votes were cast for the IBT, sixteen for the Airline Pilots Association, five for an in-house union, one for "PATCO," and one for "RAPA." Because less than a majority of those eligible had voted, no representative was certified. On January 23, 1996, the IBT filed a complaint with the NMB

alleging that Horizon had interfered with the election process. The IBT presented supplementary evidence and argument to the Board on February 9, 1996, and Horizon submitted evidence and argument on March 4. Both parties submitted written responses to the other's submissions.

The NMB held a second investigation, this time to determine whether the carrier interfered with, influenced or coerced employees in their selection of a representative. After examining the history of the PIREPS program, as well as the carrier's actions during the IBT campaign, the Board found that, "[b]ased upon the totality of the circumstances," Horizon had interfered with employee free choice when it "communicated to pilots that the PIREPS Program was a substitute for a collective bargaining representative; used the PIREPS program to provide work rule improvements during the organizing campaign; represented that PIREPS had undergone significant changes that responded to pilot concerns and permitted more impact from the pilots." *Horizon Airlines*, 24 N.M.B. 458, 508–09 (1997). The NMB ordered a re-run election using the Board's standard ballot. The Board also informed the company that it would send a notice to employees explaining why the re-run election had been ordered, and it required the company to post an identical notice "at all stations." The notice stated that the NMB found employer interference during the election process, and included those portions of the RLA that make such interference unlawful. The second set of ballots were counted on September 12, 1997, and the Teamsters were certified as the pilots' bargaining representative on September 17, 1997.

On January 23, 1998, Horizon filed suit in the Western District of Washington, alleging that the NMB had acted outside the scope of its authority by finding that the company had interfered in the election and by applying a new standard retroactively, and that the NMB had violated Horizon's constitutional rights by abridging its freedom of speech and forcing it to make a legal admission of interference.

The district court dismissed the case with prejudice.

## II.

*Jurisdiction to Review NMB Actions*

Federal court jurisdiction over NMB actions is extraordinarily limited. *Switchmen's Union v. National Mediation Bd.*, 320 U.S. 297, 300–01, 64 S.Ct. 95, 88 L.Ed. 61 (1943); *America West Airlines v. National Mediation Bd.*, 986 F.2d 1252, 1256 (9th Cir.1993) (*"America West I"*). In fact, it has been observed to be "one of the narrowest known to the law." *International Ass'n of Machinists & Aerospace Workers v. Trans World Airlines*, 839 F.2d 809, 811 (D.C.Cir.1988). This limited jurisdiction is directly tied to the Board's unique role in labor disputes. Unlike the NLRB, which has broad adjudicatory and remedial powers, the NMB was set up to help the parties to a dispute reach quick resolution themselves. *See* 9 THEODORE KHEEL, LABOR LAW § 50.04[1] (1964). To achieve this goal, the NMB focuses on the administration and determination of representation disputes, and the mediation of collective bargaining controversies. *See id.* Since its role was limited to assistance in dispute resolution rather than punishment of violators, judicial oversight of the NMB's actions has been far more limited than the review afforded to NLRB actions. *See id.* § 50.04[1], [2][c]; *see also Switchmen's Union of North America v. National Mediation Bd.*, 320 U.S. 297, 300–01, 64 S.Ct. 95, 88 L.Ed. 61 (1943) (Article III courts are without jurisdiction to review certification decisions by the NMB); *Brotherhood of Ry. & S.S. Clerks v. Assoc. for the Benefit of Non–Contract Employees*, 380 U.S. 650, 661, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965) (courts may review claims that the NMB "ignored an express command of the Act.").

The courts' limited role in reviewing the NMB's decisions was explained by the Supreme Court in *Switchmen's Union of North America v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed.

61 (1943), which involved a challenge to the certification of a union by the NMB. The Court closely examined the portions of the Railway Labor Act's legislative history that created the NMB. *See id.* at 301–07, 64 S.Ct. 95. Discussing the purpose of the RLA scheme, the Court concluded that Congress intended to give the Board discretion over, and the power to resolve finally, representation disputes. *Id.* For that reason, federal courts have, ever since, had no jurisdiction over the merits of a representation dispute decided by the NMB. *See* Kheel, *supra*, § 50.04[2][c]. As a practical matter, this means that the NMB's decisions regarding its methods of investigation, balloting procedures, and findings regarding employer interference, influence, or coercion, have been largely unreviewable.

▪ There are two kinds of challenges to NMB action over which federal courts may exercise jurisdiction, however. First, federal courts have jurisdiction to review allegations that the NMB has acted outside its legislative authority. In *Brotherhood of Railway & Steamship Clerks*, the Supreme Court explained that the actions of the NMB were reviewable "only to the extent that [the review] bears on the question of whether [the NMB] performed its statutory duty to 'investigate' the dispute." 380 U.S. at 661, 85 S.Ct. 1192 (quoting the RLA, 45 U.S.C. § 152, Ninth). This court has explained that "the federal courts have jurisdiction to determine whether the Board has mistakenly stepped out of the investigator's inverness into the robe of the adjudicator. If the Board has done so, it has exceeded its statutory authority—regardless of whether its action also happens to be employed as an investigatory tool." *America West Airlines v. National Mediation Bd.,* 986 F.2d 1252, 1258 (9th Cir.1993) (hereinafter *"America West I"*). Second, federal courts have jurisdiction to review allegations that the Board has acted unconstitutionally in carrying out an investigation. *See America West v. National Mediation Bd.,* 119 F.3d 772, 775 (9th Cir.1997) (hereinafter *"America West II"*).

▪ We take only a "peek at the merits" to determine if the NMB has committed an error of these dimensions. Unless the "peek" reveals an error that is obvious on the face of the papers without extension to "arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide," the court is without jurisdiction to proceed further. *See Brotherhood of Ry. & S.S. Clerks v. Association for the Benefit of Non–Contract Employees,* 380 U.S. 650, 671, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965). We have adopted the "peek" framework—for both statutory and constitutional claims—because it "furthers the purpose of the RLA" to obtain the speedy resolution of representation disputes without the "haggling and delays of litigation" that a full review on the merits would create. *See America West II,* 119 F.3d at 775 (quoting *Brotherhood of Ry. & S.S. Clerks v. Association for the Benefit of Non–Contract Employees,* 380 U.S. at 671, 85 S.Ct. 1192). The rule "enables a court to determine if the NMB has committed a gross violation of the RLA without causing undue delay." *Id.*

Regarding the second kind of claim—that the NMB has violated the constitutional rights of the employer—this court, the D.C. Circuit, and the Sixth Circuit have all stated in dicta that the same "peek at the merits" approach should be used. *See id.; Professional Cabin Crew Ass'n v. National Mediation Bd.,* 872 F.2d 456, 459 (D.C.Cir.1989); *Brotherhood of Maintenance of Way Employees v. Grand Trunk Western R. Co.,* 961 F.2d 1245, 1249 (6th Cir.1992). None of these courts, however, have actually used that approach to determine the outcome of a controversy. In May 1999, the D.C. Circuit rejected its own earlier dicta that claims of constitutional violations by the NMB should both be examined under the "peek at the merits" framework. *See U.S. Airways,* 177 F.3d at 990. The court did not disturb the "peek" framework in relation to claims of *ultra vires* action, but held that constitutional challenges should be examined on their "full merits." *Id.* ("Constitutional ar-

guments cannot sensibly be restricted to the plain text of the clause at issue, which is what the 'peek' framework would require."). This court has never used the "peek at the merits" rubric to evaluate a constitutional claim, but we have approved the approach in dicta. *See America West II*, 119 F.3d at 775 (explaining that the "peek" framework best suited Congressional intent). We reaffirm our earlier reasoning and decline to adopt the D.C. Circuit's approach to cases alleging constitutional violations. Instead, we will "peek at the merits" of Horizon's claims that the NMB took *ultra vires* actions and violated its constitutional rights. This approach is best suited to fulfill Congressional intent, since it will allow courts to check improper NMB actions without causing undue delay in the determination of valid labor representation.

## III.

### A. *Allegation of Statutory Violation*

 Horizon alleges that the NMB acted outside its statutory authority when it sent a notice to Horizon pilots stating that the carrier had interfered in the election to determine the employees' representative. The notice, Horizon contends, constituted an unauthorized *adjudication* of an unfair labor practice, outside the NMB's statutory authority to *investigate* representation disputes. Under the Railway Labor Act, the NMB is authorized (1) to investigate "any dispute" regarding "who are the representatives" of employees covered by the RLA, and (2) to certify the representative once identified. 45 U.S.C. § 152, Ninth (2000). It has "no authority to adjudicate unfair labor practices." *See America West I*, 986 F.2d at 1257. In undertaking its investigation, the Board may use any "appropriate method" to determine the identity of the representative. 45 U.S.C. § 152, Ninth. The NMB employs such methods to ensure that balloting is carried out without interference, influence, or coercion by employers, perfecting the election atmosphere so the NMB may make an accurate, independent determination of who the employees

want to act as their representative. The atmosphere required for such a determination is characterized by what the NMB calls "laboratory conditions." *See Evergreen Int'l Airlines*, 20 N.M.B. 675, 711 (1993). As we have stated, however, in employing these investigatory tools, the NMB may not "step[ ] out of the investigator's inverness into the robe of the adjudicator." *America West I*, 986 F.2d at 1258. Horizon claims NMB took such a step by sending a notice to the pilots stating that the carrier had interfered in the election. "Peeking" at the merits, we hold the NMB did not exceed its statutory authority.

Horizon relies on *America West I* for its argument. In that case, we determined that while the Board has the authority to use a notice as an investigatory tool, it could not make a finding that the carrier "improperly interfered" with an election, since such a finding implied an adjudication of unlawful action by the carrier. 986 F.2d at 1259.

In this case, the NMB found that Horizon's actions, taken as a whole, involved interference. The NMB summarized its findings as follows: "Horizon communicated a clear message to the pilots that it preferred PIREPS, the quasi-pilot bargaining program it had created and supported, to the IBT. Horizon also used the PIREPS program to provide work rule improvements after the carrier learned of the IBT's campaign." *Horizon Airlines*, 24 N.M.B. at 500. Based on this finding of interference, the NMB ordered a re-run election, and sent a notice to the employees with their ballots explaining this finding.

Horizon objects to the notice on the grounds that it involved an "adjudication" of interference, something that was beyond the Board's power. The carrier relies on a Ninth Circuit case to make this argument. In *America West I*, this court examined a notice very similar to the one at issue here. In that case, we determined that while the Board did have the authority to use the notice as an investigatory tool, it could not

make a finding that the carrier "improperly interfered" with an election, since such a finding implied that the Board had made a determination of unlawful action by the carrier. *See America West I*, 986 F.2d at 1259. Such a determination was outside the scope of the NMB's limited authority, and therefore the notice was improper. In this case, the notice stated that "the National Mediation Board found that the Carrier's conduct, taken as a whole, interfered with, influenced or coerced employees' choice of representative under Section 2, Ninth, of the Act." *Horizon Airlines*, 24 N.M.B. at 510. The word "improperly" was omitted, and the statutory authority cited in the notice is to the section of the RLA outlining the NMB's powers, instead of the section setting out criminal sanctions for employers who violate the act. Unlike the notice in *America West I*, the notice here does not follow the finding immediately with a recitation of the legal standard governing the carrier's conduct.[3] *See America West I*, 986 F.2d at 1255. Instead, it includes two paragraphs concerning the re-run election, making clear that the finding was announced in order to explain the purpose of the re-run election. *See Horizon Airlines*, 24 N.M.B. at 510. This court's holding in *America West I* was based on the misleading nature of the notice, which, when examined structurally, could lead the reader to conclude that the NMB had *adjudicated* the carrier to have acted illegally by interfering. *See America West I*, 986 F.2d at 1259. Indeed, the court noted that no one suggested that the sending of a notice stating that the election was being re-run because of carrier interference was in itself outside the scope of the NMB's authority. *See id.* at 1255. What mattered was the phrasing. *See id.* Because the phrasing of the notice in this case does not contain the errors found in the *America West I* case, and because it does not read like an adjudication, we decline, under the "peek at the merits" standard, to find this notice outside the Board's authority.[4]

## B. Allegations of Constitutional Violations

### 1. Posting Notice as Violation of Horizon's Fifth Amendment Rights

■ In its order setting aside the first election, the NMB ordered Horizon to post the same notice it mailed discussing the need for the second election in all workstations. Horizon argued that this required posting violated its Fifth Amendment rights because it "appeared Horizon was forced to admit past unfair labor practices to all employees." Brief for appellant at 27. Horizon is entitled to relief under the Fifth Amendment only if it demonstrates the notice appeared to be a carrier-issued admission concerning the NMB's adjudication of employer interference. If this were the case, the required posting could be found to be the equivalent of compelled self-incrimination. Taking a "peek," we find that it does not.

Like the argument that the NMB's mailed notice was an *ultra vires* act, this argument draws on our decision in *America West I*, where we stated that the NMB may not use a notice as a remedy for unfair labor practices. *America West I*, 986 F.2d at 1257. The issue turns on whether the notice appears to have been a carrier-issued admission concerning the NMB's adjudication of Horizon's actions, or alternatively, whether it appeared to be a notification to Horizon employees of the reasons underlying the re-run election. Horizon is entitled to relief under the Fifth Amendment only if it has demonstrated

---

3. In a different section, the notice does include a quotation from the RLA, stating that it is unlawful for a carrier to interfere with its employees' choice of a representative.

4. Another important difference between *America West I* and this case is that the *America West I* court was reviewing a preliminary injunction entered by the district court enjoining use, pendente lite, of the notice. The court was limited to determining, therefore, whether the injunction was an abuse of discretion, and could not undertake a complete review of the merits of the case. *See America West I*, 986 F.2d at 1259.

that the notice appeared to be a Horizon-generated description of an adjudication, and that the required posting was thus the equivalent of compelled self-incrimination.

As explained above, the notice in this case did not present the NMB's finding as an adjudication of the interference issue. Nor did the notice appear to have been issued by the company itself: the notice included the address and phone number of the NMB, as well as information concerning the standards guiding representation elections. A rational reader would not have inferred that it was written by Horizon. The carrier's argument thus fails on both prongs. Horizon's due process rights were not violated by the required posting of the notice.

### 2. Horizon's First Amendment Rights

Horizon further claims that the NMB's finding of election interference violated its First Amendment rights by punishing it for engaging in "pure speech." Horizon's appellate brief presented this argument as a *post hoc* challenge to the NMB's finding that the carrier's speech was a factor in its interference finding and suggested that the appropriate remedy was to invalidate the second election and reinstate the results of the first one. Under this analysis, the second election was not required at all, since the first election had been improperly invalidated. At oral argument, Horizon changed its emphasis. The carrier focused on both the NMB's order concerning the first election and on the second election independently, claiming (1) that the NMB's order concerning communications prior to the first election impermissibly punished speech that was protected by the First Amendment, and (2) that Horizon was subjected to a prior restraint on speech during the second election, since the NMB's findings concerning the first election effectively circumscribed the content of the carrier's speech during the second election. Based on this argument,

Horizon asks the court to invalidate the second election and reinstate the first one.

To make its case, Horizon relied heavily on a D.C. Circuit case concerning an NMB order very similar to the one at issue here. *U.S. Airways v. Nat'l Mediation Bd.*, 177 F.3d 985 (D.C.Cir.1999), was decided between the close of briefing and oral argument in this case.[5] In that case, the NMB was concerned with U.S. Airways' relationship to and use of employee committees during a unionization campaign at the carrier. In response, the NMB articulated and applied a five-factor test concerning carrier manipulation of employee committees. *See U.S. Airways*, 24 N.M.B. 354, 385 (1997). The Board set out five different kinds of conduct regarding such committees that should be considered when determining, under the totality of the circumstances, whether the carrier had sullied the "laboratory conditions" required for an election:

1) The establishment of a committee at any time after the carrier becomes aware of a labor organization's organizing efforts;

2) A material change or a carrier representation of such a change, during the critical period in the purpose or activities of a pre-existing committee;

3) The use of a pre-existing committee to expand employee benefits during the critical period (the continuation of existing benefits is a prerequisite of a fair election);

4) Carrier campaigns which indicate a pre-existing committee is, or should be, a substitute for a collective bargaining representative;

5) Carrier campaigns which indicate that the certification of a labor organization as the representative of the employees will lead to the termination of a pre-existing committee.

*Id.* The NMB found that U.S. Airways had interfered in the election, and ordered a

5. The D.C. Circuit's *U.S. Airways* opinion was filed on May 28, 1999. Briefing in this case was completed on December 11, 1998 and oral argument was conducted on March 8, 2000.

re-run election. *See id.* U.S. Airways appealed this finding under the First Amendment in federal district court. The district court rejected the carrier's free speech challenge, and U.S. Airways appealed. *See U.S. Airways v. National Mediation Bd.,* No. 97–1508(GK), 1998 WL 464945 (D.D.C. July 21, 1998).

On appeal, the D.C. Circuit rejected the district court's analysis. First, the court adopted the Supreme Court's rule concerning employer speech, developed in the NLRB context, as the appropriate standard for considering NMB findings that examine employer speech. The Supreme Court's rule is set out in *Nat'l Labor Relations Board v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In *Gissel,* the Court explained that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board." *Id.* at 617, 89 S.Ct. 1918. This right is not absolute, however, and must be balanced against the employees' rights to associate freely and to be free of coercion, which can sneak in through seemingly-neutral employer communications. *Id.* To separate acceptable speech from coercive speech, the Court laid out the following rule:

> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at ... in the case of unionization.

*Id.* at 618, 89 S.Ct. 1918 (internal citation omitted).

In *U.S. Airways,* the D.C. Circuit applied the *Gissel* rule to the NMB's five-factor standard. The court approached the list of factors disjunctively, and found that factors four and five acted independently and apart from other considerations to restrain the employer's speech during the NMB-ordered re-run election. *U.S. Airways,* 177 F.3d at 992–93. Factor four concerned carrier communications that indicated that a pre-existing employee committee was a substitute for a collective bargaining representative, and factor five dealt with carrier communications that indicated the pre-existing committee would cease to exist if employees approved the union as their representative. *Id.* at 992. The court found that these factors regulated pure speech, and that they were overly broad, since they did not distinguish between communications that made (permissible) objective predictions and (impermissible) subjective predictions about the consequences of the election's outcome. *Id.* at 992–93. Since this distinction was required under the Supreme Court's *Gissel* standard, the court found that the carrier's speech had been unconstitutionally chilled during the re-run election. *Id.* at 992–94. The court found that the only appropriate remedy was to set aside the results of the second election. It remanded the case to the district court with instructions to remand to the NMB to set aside the election and proceed in accord with the court's decision. *Id.* at 994.

On remand, the NMB clarified its finding of interference, stating that "[t]he Board concludes that the Carrier engaged in conduct, independent of the Carrier's constitutionally protected speech, which tainted the laboratory conditions essential to representation elections by interfering with the employees' selection of a collective bargaining representative." *U.S. Airways,* 26 N.M.B. 323, 326–27 (1999).[6] For these reasons, the NMB ordered another re-run election. *Id.*

---

**6.** This order was made public on June 25, 1999.

In the instant case, the NMB applied the same five factors it articulated in *U.S. Airways* to analyze Horizon's conduct during the first election. It explained that the factors "were designed to provide 'general guidance concerning carrier actions in connection with employee committees.'" *Horizon Airlines*, 24 N.M.B. at 504. The Board relied in part on three of the five factors to conclude there had been interference by Horizon in the election: (a) the fact that Horizon "sought to convince the pilots that PIREPS was a substitute for a collective bargaining representative" (factor four); (b) Horizon's use of the PIREPS program to implement changes in working conditions during the critical period (factor three); and (c) Horizon's representation "that PIREPS had undergone significant changes that responded to pilot concerns and created more input from pilots" (factor two). *See id.* at 504–05. The Board stressed that its findings were "[b]ased upon the totality of the circumstances." *See id.* at 500. Further, the NMB used only one of the factors discussed by the D.C. Circuit (factor four) in making its findings regarding Horizon.

We must decide two issues regarding Horizon's First Amendment rights in this case. First, we must determine whether the NMB's order finding interference in the first election violated Horizon's free speech, requiring us to reinstate the results of that election. Second, if we determine that there was no constitutional violation regarding the NMB's invalidation of the first election, we must decide whether the NMB's order had an impermissible chilling effect on the carrier during the second election, requiring us to overturn the results of that election.

▮ Regarding the first issue, we hold that the Board's finding that there was carrier interference was not based solely on the carrier's speech. We do not follow the D.C. Circuit's treatment of the NMB's five factor test. The *U.S. Airways* court found that the NMB's factors must be read disjunctively, since the Board had not made clear whether any one of the

factors, standing alone, would have amounted to interference. *U.S. Airways*, 177 F.3d at 992. We disagree with this interpretation. It is established NMB practice to examine the "totality of the circumstances" in order to determine whether a carrier has interfered with a representation election. *See* Daniel M. Katz & Erica J. Dominitz, *Recent Developments in NMB Election Interference Cases and Employee Committees*, ALI–ABA 109, 111 (1999) (in determining whether an employer has disturbed the "laboratory conditions" necessary for an election, the NMB looks for "sterile conditions" by examining "the 'totality of the circumstances'") (citing *Continental Airlines*, 221 N.M.B. 229 (1994)). In light of this practice, we believe the most plausible reading of the NMB's five factor standard treats the factors as examples of specific conduct the Board considers alongside others when making its "totality of the circumstances" finding. None were presented as independently dispositive. In this case, the NMB order repeatedly referred to the aggregate effects of Horizon's speech-related activities and interfering conduct. A rational employer reading the NMB's order would have understood the standard being applied here; it was the traditional "totality" test, refined in the context of employer-sponsored committees.

▮ A set of NMB cases decided before the Board articulated its five-factor test in *U.S. Airways* supports this interpretation. In *Metroflight*, 18 N.M.B 532 (1991), *Federal Express*, 20 N.M.B. 7 (1992), *Evergreen Int'l Airlines*, 20 N.M.B. 675 (1993), and *Continental Airlines*, 21 N.M.B 229 (1994), the NMB considered allegations that carriers had used employee committees during election campaigns to interfere with employee choice. In all but *Continental Airlines*, the Board found that the employer had disturbed the sterile conditions necessary for the election and ordered a re-run election. These cases give context to the NMB's *U.S. Airways*

five-factor test, used to evaluate Horizon's conduct. In each case, the NMB examined the totality of the circumstances when considering whether carriers manipulated employee committees. Given this context, there was no reason for Horizon to interpret the NMB's order as a major, unconstitutional change from the past; instead, the order articulated a set of factors that could be used when considering whether an employer interfered, under the totality of the circumstances, with their employees' choice of a representative.[7] *See* Katz & Dominitz, *supra*, at 112–15 ("[T]he Board's decision in *U.S. Airways* did not differ in degree or kind from previous policies") (citation omitted). Further, the NMB repeatedly made reference to the totality of the circumstances in its order. For these reasons, we reject Horizon's argument that its First Amendment rights were violated when the Board invalidated the first election.

 We are similarly unconvinced that the carrier was subjected to a prior restraint on speech during the second election. In *U.S. Airways*, the D.C. Circuit stressed that the carrier made a request for a temporary restraining order ("TRO") following the NMB's invalidation of the initial unionization election. The TRO application was "predicated in part on its chill theory, after the Board had issued its order and before the re-run election was held," and by filing suit immediately, the carrier "was hardly sitting on its claim." *U.S. Airways*, 177 F.3d at 994. Here, in contrast, Horizon did not file for a TRO, but waited for the results of the second election. Only when the outcome of the second election was against its interests, did Horizon file suit. Our cases, as well as those handed down by the Supreme Court,

have repeatedly stressed that the NMB was created to dispose of certification disputes quickly and efficiently. *See America West II*, 119 F.3d at 775 (NMB part of statutory scheme aimed at "speedy resolution" of representation disputes); *Switchmen's Union of North America*, 320 U.S. at 303, 64 S.Ct. 95 (NMB created to "get the matter settled") (internal citation omitted). Likewise, the extraordinarily narrow scope of our jurisdiction to review the NMB's actions was established to avoid "causing undue delay." *America West II*, 119 F.3d at 775; *see also Switchmen's Union of North America*, 320 U.S. at 305, 64 S.Ct. 95 (federal courts not given jurisdiction to review the merits of the NMB's actions, since it was Congress' intent that "there was to be no dragging out of the controversy into other tribunals of law"). Allowing a carrier to wait to press its claim until after it has lost the second election would be contrary to Congressional intent in establishing the NMB.

Further, we distinguish the D.C. Circuit's decision, which was based on the proposition that factors four and five (not applied here) could be read to apply separately to speech alone. As discussed above, we find that the NMB's totality of the circumstances approach was both well established and emphasized in the order, such that a reasonable carrier would understand it need not refrain from political speech. *But see U.S. Airways*, 177 F.3d at 994 (stating that the NMB order "informed U.S. Airways of what sort of expression was proscribed"). Certainly, if Horizon was confused about the NMB's order, it could have sought a TRO before the second election. In light of the NMB's totality of the circumstances standard, we

---

7. Because we do not treat the factors disjunctively, we need not comment on, or apply, the *Gissel* standard, used by the D.C. Circuit in *U.S. Airways* and discussed *supra*. *See U.S. Airways*, 177 F.3d at 991–94. We note, however, that standards like *Gissel,* developed in the NLRA context, must be very carefully imported into the RLA context. As the Supreme Court has explained, "the National Labor Relations Act cannot be imported whole-

sale into the railway labor arena. Even rough analogies must be drawn circumspectly, with due regard for the many differences between the statutory schemes." *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). This is especially true in cases dealing with the NMB, whose purpose and powers are so very different from those of the NLRB.

will not invalidate the second election on the grounds that the carrier of its own volition may have taken a cautious approach. A "peek at the merits" has revealed no constitutional violation.

For these reasons, we AFFIRM the district court.[8] The results of the second election shall stand.

---

8. In addition to the allegations discussed *supra*, Horizon objected to the NMB's application of its five-factor standard described in Section III, arguing that the rubric was created after the election to which it was subsequently applied. Under the "peek at the merits" standard, we find this argument unavailing. See discussion concerning development of NMB's five-factor standard, *supra*

pages 1137–38. Further, Horizon relies on this court's general rules concerning retroactivity in making this argument, neglecting to assert that the challenged actions amount to *ultra vires* acts. Absent such a showing, we will not disturb the NMB's caselaw. As discussed in Section II, this court does not stand as a court of errors vis-a-vis the NMB.